### HINDMAN v. O'CONNOR.

Decided July 3, 1891.

1. *Constructive trust—Purchase by* quasi *guardian.*

The purchase of a minor's property at a curator's sale by one who, through kinship and association, occupies toward him the confidential relation of a *quasi* guardian will, at the minor's instance, be declared a trust for his benefit, regardless of the good faith of the transaction.

2. *Judicial sale—Limitation.*

A suit to set aside for fraud a probate sale of land is a suit for the recovery of land sold at judicial sale, within the five-years' statute of limitation.

3. *Removal of minor's disabilities—Special statutory power.*

The power to remove the disabilities of minors is a special power conferred upon circuit courts, and is to be exercised in a summary manner and not according to the course of the common law; where the record fails to show that the minor is a resident of the county, the order declaring the removal of his disabilities is void.

APPEAL from *Phillips* Circuit Court in chancery.

JAMES P. BROWN, Special Judge.

*U. M. & G. B. Rose,* and *John C. Palmer* for appellants.

1. A curator could not sell the lands of his ward under an order of the probate court. 33 Ark., 490. Under our

present law, both the guardian and the curator must join in the deed. Mansf. Dig., sec. 3507.

2. Mrs. O'Connor was under a disability to purchase, arising from the relation she sustained at the time of the sale. Her purchase was void. 23 Ark., 622; Mansf. Dig., sec. 3485; 38 Ark., 26; 33 *id.*, 587; Lewin on Trusts, p. 484; Underhill on Trusts, p. 484; 46 Ark., 32; 30 *id.*, 44; 33 *id.*, 301; 5 Dana, 507; 61 Miss., 766; Mansf. Dig., sec. 3505; 80 Ala., 11; 40 Ohio St., 640; Schouler on Ex., sec. 142; 8 Vesey, 345; 2 Johns. Chy., 259; 1 Macq., 461; 14 N. Y., 91; Mechem on Ag., sec. 463; 1 Story, Eq. Jur., sec. 322; 2 Sugd. Vendors, p. 687; 4 How., 554; Underhill on Trusts, p. 293; 9 Paige, 661; 4 Cow., 736; 98 Mo., 159; 14 Am. St. Rep., 626; Story, Eq. Jur., sec. 317; 16 Am. Dec., 616.

3. The removal of disabilities did not have the effect of starting the statute of limitations to running against minors. Their disability to sue continued until they arrived at "full age." Mansf. Dig., sec., 4471; 42 Ark., 398; 44 *id.*, 400; 49 *id.*, 31; Mansf. Dig., sec. 3464.

4. The emancipation order is void. The record does not show the applicant to be a *resident* of the county. Acts 1869, p. 45. This is jurisdictional, and the fact of residence must appear on the face of the record. 28 Gratt., 879; 6 Wheat., 119; 2 Wall., 342; 18 *id.*, 371; Wells on Jurisdiction, sec. 162; 51 Ark., 35; 11 Wend., 648; 7 Hill, 24; Lawson, Pres. Ev., p. 27; 5 Ark., 27; *ib.*, 358; 6 *id.*, 41; 9 *id.*, 480; 10 *id.*, 316; Freeman, Judg., sec. 123; 48 Ark., 305.

5. Mansf. Dig., sec. 4474, has application to suits to set aside a sale for fraud. 31 Ark., 372.

6. The statute did not begin to run until the infants arrived at twenty-one years, and the three years clause is not applicable. 34 Ark., 590; 51 *id.*, 297. Nor does it run until the guardianship closes. Buswell on Lim., sec. 329; 33 Ark., 658; 28 *id.*, 191.

7. No offer to return the purchase money was necessary. 44 Ark., 293 ; 51 *id.*, 299.

*Stephenson & Trieber* and *John J.* and *E. C. Hornor* for appellee.

1. Whatever the relation Mrs. O'Connor bore to these children terminated when the guardian filed his petition for a sale, and when she bid off the property. She was never the guardian, and at most was not fully *in loco parentis.* No dissent or dissatisfaction was expressed for more than six years after the confirmation of the sale, full three years of which existed after the disabilities were removed. This bars their right. 36 Ark., 390; 46 Ark., 25 ; 48 *id.*, 248 ; 7 S. and M., 409; 45 Am. Dec. 310; 2 Pom. Eq. Jur., secs. 815, 917, 965 ; Story, Eq. Jur., sec. 385 ; 86 Ky., 572 ; 31 Minn., 468; 20 Neb., 347; 19 *id.*, 429; 61 Mich., 471; 27 S. C., 300. Guardians may purchase when the sale by a public officer is inevitable, and when they have no funds of their wards. 32 Pa. St., 315 ; 72 Am. Dec., 789 ; Pet., C. C., 378; 16 Ia., 284; 85 Am. Dec., 516. Appellee was not a guardian, and no duty was imposed upon her as to the conduct or management of the sale. 82 Cal., 351.

2. The purchase by a trustee is not void, only voidable, and will not be set aside in all cases by courts of equity. 36 Ark., 383; 46 *id.*, 25 ; 48 *id.*, 248 ; 47 *id.*, 419. The failure of the minors to appeal, under the ruling in 36 Ark., 383, is an election to take the proceeds and discharge the trust. 39 Ark., 131 ; 33 *id.*, 468; 64 Ala., 410; 38 Ill., 382 ; 19 *id.*, 295 ; 1 Story, Eq. Jur., sec. 385.

3. Appellants were barred. The statute began to run from the confirmation of the sale. 46 Ark., 25 ; 44 *id.*, 479. As to Thomas C., his disabilities were removed, and more than three years elapsed before suit.

4. It was not necessary that the order of emancipation should recite that they were citizens or residents. 10 Wheat., 193; 24 Ark., 155; 117 U. S., 255; 2 Wall., 329; Freeman, Judg., secs. 116, 118, 119, 122, 123, 126, 128; 49

Ark., 398; 44 *id.*, 267; 11 Ark., 519. The removal of the disability of non-age sets in motion the statute. 47 Ark., 558. The rule as to coverture is distinguishable. 47 Ark., 305.

5. It was not necessary to unite the guardian and curator in order to make a deed to a minor's land. Gould's Dig., p. 574, secs. 32, 33–4; Mansf. Dig., sec. 3507.

6. No offer to refund the purchase price was made.

BATTLE, J. In September, 1867, Thomas C. Hindman, and on the 19th of August, 1876, Mary B. Hindman, his wife, died intestate, leaving Susie Hindman, Biscoe Hindman, Thomas C. Hindman, Jr., and Blanche Hindman, their only children, surviving them. Biscoe, Thomas C. and Blanche were minors when their parents died, Biscoe having been born on the 27th of November, 1861, Thomas C. on 23d of November, 1863, and Blanche on the 2d of December, 1865. Laura E. B. O'Connor and the mother of Mrs. Hindman were sisters, and Mrs. O'Connor (Laura E. B.) was the step grandmother of Mrs. Hindman's children, she having been the wife of their grandfather. When Mrs. Hindman was on her death-bed, she requested Mrs. O'Connor to take charge of her children, and she promised that she would to the best of her ability, and proceeded to do so, immediately after the death of Mrs. Hindman, by taking them home with her and exercising personal supervision over them. On the 5th of September, 1876, Susie, Biscoe and Thomas C. Hindman filed a petition in the Phillips probate court, stating that they and Blanche Hindman were children and heirs at law of Mary B Hindman, deceased; that Biscoe, Thomas C. and Blanche were minors; that they were the owners in their own right of an interest in real estate in the county of Phillips in this State, and equally entitled to a distributive share in the estate of their mother, the late Mary B. Hindman; and representing that their mother had requested that Mrs. O'Connor and her husband should take charge of and have the entire control and cus-

tody of her children, and assist in the management of their property interests; and asking that B. Y. Turner be appointed curator of the estate of the minors. On the same day the probate court granted the petition, and B. Y. Turner, having given bond with approved security, was appointed curator of the estate of Biscoe, Thomas C. and Blanche Hindman. The court further ordered that the minors remain in the care and custody of Mrs. O'Connor and her husband, in accordance with the last wish and request of their mother; and appointed J. H. O'Connor, the husband of Mrs. Laura E. B. O'Connor, the attorney and next friend of the minors "to look after and render such aid and assistance to the curator as may be necessary for their interest." After this the children continued to live with Mrs. O'Connor, and she endeavored to act the part of a mother to them. They were the owners of block 17, in that part of the city of Helena known as New Helena, having thereon a valuable residence, the late home of their father and mother, and other buildings. It became delinquent for taxes for the years 1873, 1874 and 1875, and she redeemed it by paying $896.87, the cost of redemption. Susie, needing money to enable her to attend school and pay her debts, offered to sell and convey to her her (Susie's) interest in the block. She bought it and became the owner of one undivided fourth of the block. On the 22d of November, 1880, Bart Y. Turner, curator of the estate of the minor children, presented his petition to the Phillips probate court for an order to sell the minors' interest in the block; and the court, finding that it was to the interest of the minors that it should be sold to procure means for their support and education, ordered it to be sold on the 10th of January, 1881. The block was not sold on that day for the want of bidders; and the court again ordered it to be offered for sale and fixed the 11th of April, 1881, as the day of sale. The entire block, including the one-fourth purchased from Susie, with the consent of Mrs. O'Connor, was offered for sale on the last named day and Mrs. O'Connor, at the request of the children, bid for the

same. She offered $4000 for the block and, no one bidding more, she was declared the purchaser. The curator reported the sale to the probate court for confirmation. It having been reported that one A. H. Johnson would have given $4200, the children were dissatisfied and filed exceptions to the report. Mrs. O'Connor thereupon offered $4500, and the $4000 in the report was changed to $4500, and the exceptions were withdrawn, and the sale was confirmed by the court; and the property was conveyed to Mrs. O'Connor. Three-fourths of the purchase money, amounting to $3375, which was the proportion due the minor children, have been paid.

**1. When constructive trust arises.** To set aside the purchase of the three-fourths interest of the block that belonged to Biscoe, Thomas C. and Blanche Hindman, this action was brought by them since they ceased to be minors. They contend that Mrs. O'Connor was under a disability to purchase, arising from the relation she sustained to them at the time the block was sold. Can they avoid the sale?

As a general rule, a party occupying a relation of trust or confidence to another is, in equity, bound to abstain from doing everything which can place him in a position inconsistent with the duty or trust such relation imposes on him, or which has a tendency to interfere with the discharge of such duty. Upon this principle no one placed in a situation of trust or confidence in reference to the subject of a sale can be the purchaser, on his own account, of the property sold. If such a one purchases the property, it is in the option of the person interested in the property, and to whom the relation of trust or confidence was sustained, to set aside the sale within a reasonable time, however innocent the purchaser may be. I Story, Eq., secs. 307–323, and cases cited.

In Sugden on Vendors, the rule and its reason are expressed as follows: "It may be laid down as a general proposition, that trustees, unless they are nominally such, as trustees to preserve contingent remainders, agents, com-

missioners of bankrupts, assignees of bankrupts, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of sale, counsel, or any persons who, by being employed or concerned in the affairs of another, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under the restrictions which will shortly be mentioned. For, if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not to exercise it for the benefit of the persons relying on their integrity. The characters are inconsistent. *Emptor emit quam minimo potest, venditor vendit quam maximo potest.*" 2 Sugden on Vendors (7th Am. ed.), star page 887; *Michoud* v. *Girod*, 4 How., 504.

In *Imboden* v. *Hunter*, 23 Ark., 622, this court said: " It is a stern rule of equity that a trustee to sell for others is not allowed to purchase, either directly or indirectly, for his own benefit, at the sale. He cannot be both vendor and purchaser. As vendor, it is his duty to sell the property for the highest price, and as purchaser, it is his interest to get it for the lowest, and these relations are so essentially repugnant—so liable to excite a conflict between self-interest and integrity, that the law positively forbids that they shall be united in the same person. And it matters not, in the application of the rule, that the sale was *bona fide* and for a fair price. The enquiry is not whether there was fraud in fact. In such a case, the danger of yielding to the temptation is so imminent, and the security against discovery so great, that a court of equity, at the instance of the *cestui que trust*, if he applies in a reasonable time, will set aside the sale, as of course. The rule is not intended to remedy actual wrong, but is intended to prevent the possibility of it. The situation of the party, *itself*, works his disability to purchase. * * * The rule is not confined to persons who are trustees within the more limited and technical signification of the term, or to any particular class of fiduciaries, but ap-

plies to all persons placed in a situation of trust or confi-
dence with reference to the subject of the purchase. It
embraces all that come within its principle, permitting no one
to purchase property and hold it for his own benefit, where
he has a duty to perform, in relation to such property,
which is inconsistent with the character of a purchaser on
his own account, and for his individual use."

Following the rule laid down in *Imboden* v. *Hunter, supra,*
this court held, in *Wright* v. *Walker,* 30 Ark., 44, that "the
purchase by an attorney, at tax sale, of land in regard to
which he had been retained," was inconsistent with his re-
lations to his client, and could be avoided by the client, not-
withstanding there was no bad faith in the purchase. After
a careful examination of numerous authorities, it held that
it was a well-settled principle that no one can be permitted
to purchase an interest when he has a duty to perform that
is inconsistent with the character of a purchaser; quoting
the remark of Lord Thurlow in *Hall* v. *Hallett,* 1 Cox, 134,
that " no attorney can be permitted to buy in things in a
course of litigation of which litigation he has the manage-
ment. This the policy of justice will not endure."

In *West* v. *Waddill,* 33 Ark., 587, reiterating the doctrine
laid down in the cases cited, this court held that a purchase
of land at an administrator's sale by the attorney of the ad-
ministrator was voidable at the instance of the heirs of the
intestate to whose estate the land belonged.

In *Livingston* v. *Cochran,* 33 Ark., 294, this court, in con-
sidering the validity of a purchase of lands by a probate
judge at a sale made by an administrator under an order of
the court of which he was the judge, after quoting, as we
have, from *Imboden* v. *Hunter,* said: "All that is above
said in relation to trustees purchasing at sales made by them
applies, on principle, to the case of a probate judge pur-
chasing at a sale made upon his own order, and which he is
obliged to have conducted fairly, and for the benefit of cred-
itors, legatees or distributees of the estate."

In *Clements* v. *Cates*, 49 Ark., 242, this court used the following language: "The law forbids a trustee, and all other persons occupying a fiduciary or *quasi* fiduciary position, from taking any personal advantage, touching the thing or subject as to which such fiduciary position exists. * * * If such a person acquires an interest in property as to which such relation exists, he holds it as a trustee for the benefit of those in whose interest he was prohibited from purchasing, to the extent of the prohibition. This rule applies to tenants in common by descent, with the same force and reason as it does to persons standing in a direct fiduciary relation to others. For they stand by operation of law in a confidential relation to each other, as to the joint property, and the duty is imposed on them to protect and secure their common interests. They have a community of interest which produces a community of duty, and imposes on each one the duty to exercise good faith to the others. Neither one can take advantage of the others by purchasing an outstanding title or incumbrance and asserting it against them. Such an act would be inconsistent with good faith, and against the reciprocal obligations to do nothing to the prejudice of each other's equal claims which their relationship created. Such a purchase, notwithstanding the design of the one making it was to the contrary, would be for the common benefit of all the cotenants, and the legal title acquired would be held in trust for the others, if they should choose, within a reasonable time, to claim the benefit thereof, by contributing, or offering to contribute, their proportion of the purchase money."

We have quoted at length from the opinions of this court to show the reason and extent of the rule laid down. Its applicability to guardians and wards and persons standing in like relation is apparent. Judge Story, in speaking on this rule, says: "In the next place, as to the relation of guardian and ward. In this most important and delicate of trusts the same principles prevail, and with a larger and more comprehensive efficiency. It is obvious that, during

the existence of the guardianship, the transactions of the guardian cannot be binding upon the ward if they are of any disadvantage to him; and indeed the relative situation of the parties imposes a general inability to deal with each other. But courts of equity proceed yet further in cases of this sort. They will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the terms, the fullest deliberation on the part of the ward, and the most abundant good faith (*uberrima fides*) on the part of the guardian. For in all such cases the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased; as if the accounts between the parties have not been fully settled, or if the estate still remains in some sort under the control of the guardian." 1 Story's Equity (13th ed.), sec. 317.

*Quasi* guardians and all other persons occupying the relation of confidential advisers have been held to come within the rule. *Revett* v. *Harvey*, 1 Simons & Stuart, 502; S. C., 1 Eng. Ch. Rep., 502; *Huguenin* v. *Basely*, 14 Vesey, 273; 1 Story's Eq. (13th ed.), secs. 317–319, and cases cited; 1 Perry on Trusts, sec. 204; *Torrey* v. *Bank of Orleans*, 9 Paige, 663; Underhill on Trusts, p. 293.

In *Hobday* v. *Peters*, 28 Beav., 349, a mortgagor consulted a solicitor "who turned her over to his clerk to assist her gratuitously." The clerk, by reason of information derived during such employment, bought up the mortgage for less than half the amount due thereon. The court held that the clerk was a trustee for the benefit of the mortgagor. The same was held as to the clerk of a broker employed to make sale of land, in *Gardner* v. *Ogden*, 22 N. Y., 327.

The relation sustained by Mrs. O'Connor to the Hindman children at the time of the sale in question was peculiarly

confidential. A dying mother had committed them to her care. She took them to her house and treated them as a part of her family. They were the children of her niece and the grandchildren of a former husband. Her treatment of them was kind, and, with the ties of kindred which existed between them, naturally caused them to lean on her for protection, and repose in her implicit confidence. She recognized this fact, and sometimes, if not always, responded to their wishes. At their request she moved upon the block in question, and with them occupied the late residence of their parents, and continued to do so some time before and at the time of and after the sale. At their request the probate court virtually made her and her husband the guardians of their persons, and they accepted the situation. At their request she paid out $896.87 to redeem their home from a forfeiture for taxes. When the home was offered for sale they wanted her to buy it, and looked to her to save it from sacrifice. She responded to their request, but failed to meet their expectation. She purchased, but, having heard that another would give more, they were dissatisfied. She increased her bid, and they withdrew all opposition to the confirmation of the sale by the probate court; but they had been disappointed, and the final result was a lawsuit.

But it is contended for Mrs. O'Connor that "the position occupied by her at the time of the application for an order to sell, and the sale of the property purchased by her, imposed no duty upon her as to its conduct or management;" that the conduct and management of the sale was, by the law, imposed upon Turner as curator; and that she acted fairly and in good faith. For this, among other reasons, her counsel insists that the sale should not be set aside.

In support of their contention they cite and rely upon *Jones* v. *Graham*, 36 Ark., 383. In that case the facts were: an administrator reported to the probate court that there had come into his possession a deed of trust of certain lands, executed in 1860, by one Sullivan to George W. Beasly, to secure to the intestate a debt of about $5500; " that he

had directed the trustee to sell under the power; that he had attended the sale, and, finding the lands were about to go below value, had himself bid the sum of $3040, and the lands were upon that bid struck off, no one being willing to bid more. He represented that he had no desire to keep the lands, but was willing to hold them as the property of the estate, if the court should deem it best; and submitted the matter to the court to say whether he should keep them as his own, charging himself with the net price, after paying expenses, or hold them as administrator, for the benefit of the estate." The court ordered him to keep the lands as his own, and to receipt to the estate for the proceeds of the sale, less the amount of the indebtedness of his intestate to himself. In pursuance of this order he, in his settlement, charged himself with the sum of $2715.50, as proceeds of the sale. The settlement was laid over until the second term of the court after it was filed, a period of nearly six months, when it was taken up and confirmed without objection. This court held that the whole proceeding of the court upon the report of the administrator was unauthorized and irregular; that the administrator became clothed, upon the purchase, with a constructive trust, because of the use of the means of the estate in making the purchase, and also because of his fiduciary relation to the estate, and was wearing it when he went into the probate court to ask, if deemed best, that he should be denuded by accounting for the proceeds; and that the order of the probate court had no greater effect than mere advice as to the probable future action of the court upon his settlement, when the same should be made. But this court nevertheless refused to disturb the sale. Why? The reasons assigned are: that constructive trusts are at the option of those entitled to claim the benefits; that they may leave the property in the hands of the trustee and accept the proceeds, in accordance with the legal title, and that election, deliberately and intelligently made, dispels the trust; and that in that case the action of the probate court, "in view of the obvious absence of all fraudulent intent, the

length of time that the settlement lay unchallenged, and its final confirmation," amounted to an election to take the proceeds and discharge the trust.

In *Jones* v. *Graham* the court said that it did not mean to say "that, ordinarily, the approval of a sale, or dealing with the proceeds by a probate court, would relieve a purchaser of a constructive trust;" that, ordinarily, it would not; that that case was a peculiar case—not likely to arise again ; that it stood on its own peculiar grounds, with such distinctions from reported cases as will be sufficiently obvious; and that it was not like the case of an administrator or attorney who simply purchases for himself, with the design of acquiring the property, and who has the sale confirmed without question or explanation of the circumstances. Whether the court was correct in its conclusion or not, is not necessary for us to say, but it is evident that the court did not intend to repudiate the rule announced in former cases. That case was regarded as exceptional. But this case does not come within the exception as laid down in that case. Here the purchaser bought for herself, with the design of acquiring the property. Three of the Hindman children were minors. She was *quasi* guardian of their persons, and stood to them in the place of a parent. They were under her care and protection, and the property sold was and had been in her possession. They were not *sui juris* and could not act for themselves. If the curator had failed to discharge his duty in the management of their property and in making settlements in the probate court, it was the duty of her and her husband, if of any one, to have interfered in their behalf and asserted their rights. No election to accept the proceeds and ratify the sale could have been made by them while the disabilities of minority rested upon them, and none can be imputed to them on account of any act or failure of theirs while such disabilities continued.

The doctrine as to purchases by trustees, guardians, administrators, and persons having a confidential character,

arises from the relation between the parties, and not from the circumstance that they have power to control the sale. The right to set aside the sale does not depend on its fairness or unfairness. To set aside the purchase it is not necessary to show that it is actually fraudulent or advantageous. If the trustee, or other person having a confidential character, can buy in an honest case, he may in a case having that appearance, but which may be grossly otherwise; and yet the power of the court, because of the infirmity of human testimony, would not be equal to detect the deception. It is to guard against this uncertainty and the hazard of abuse, and to remove the trustee and other persons having confidential relations from temptation, that the rule does and will permit the *cestui que trust* or other person to come at his option, and, without showing actual injury or fraud, have the sale set aside. *Davoue* v. *Fanning,* 2 Johns. Ch., 252; *Torrey* v. *Bank of Orleans,* 9 Paige, *supra;* *ex parte* James, 8 Vesey, 345; *Brockett* v. *Richardson,* 61 Miss., 766; *Van Epps* v. *Van Epps,* 9 Paige, 237; *Campbell* v. *Walker,* 5 Vesey, 678; S. C., 13 Vesey, 601; *Callis* v. *Ridout,* 7 Gill & J., 1; *ex parte* Lacey, 6 Vesey, 625; *ex parte* Bennett, 10 Vesey, 381; *Campbell* v. *Penn. Life Ins. Co.,* 2 Wharton, 62; *Michoud* v. *Girod,* 4 How. (U. S.), *supra,* and cases before cited; *McGaughey* v. *Brown,* 46 Ark., 25.

Mrs. O'Connor comes within the rule. She was virtually constituted guardian of the persons of the minor children by the order of the probate court. Her husband was appointed their attorney and next friend to look after them, and to render such aid and assistance to the curator as might be necessary for their interest. She and her husband took possession of their property, and she redeemed it. How far the curator was controlled by them does not appear, but it does appear that he permitted them to take charge of their property, obviously on account of their relation to the children. They had ample opportunities, by reason of their relation to the children, to acquire full knowledge of the property. Whether they acquired information by reason

of such relation which, if known to the public, would have caused the property to have been sold for more than it did, is not, under the rule, necessary to inquire. She occupied a confidential relation to the children, approaching nearly to that of parent to child. Whether she abused it, no inquiry under the rule can be made. She and her husband assumed the duty of taking care of the children and looking after their property. While she sustained that position, she was not permitted to purchase their property, because the right to do so might have interfered with a faithful discharge of her duty.

Mrs. O'Connor relies on the five years' statute of limitation to sustain her title. That statute provides: "All actions against the purchaser, his heirs or assigns, for the *recovery*. of lands sold at judicial sales shall be brought within five years after the date of such sale, and not thereafter; saving to minors and persons of unsound mind the period of three years after such disability shall have been removed." (Mansf. Dig., sec. 4474.) Appellants insist that that statute has no application to an action like this, the object of which is to set aside a sale of land for fraud. So *McGaughey* v. *Brown*, 46 Ark., 25, was an action to set aside a sale of land for fraud. The prayer of the bill in that case was: that the sale be set aside; that a master be appointed to take an account of the rents and profits; that the conveyances of the land, which were alleged to be fraudulent, be removed as a cloud upon the title of plaintiffs; and that they be put into the possession of the land. This court held that the object of the bill was to get possession of the land, and that the action was barred by the five years' statute.

In this case the prayer of the complaint is: that the sale be set aside; that an account be taken between the plaintiffs and defendants as to the rents and profits of the block in question and the sums paid by defendant for the benefit of plaintiffs; and that "the correct and true balance be ascertained between them;" and that said property be sold for

2. Limitation.

S C—41

purposes of partition and to satisfy the balance found by the master; and for other relief. One of the obvious objects of the complaint was the recovery of the land. That was necessary to accomplish the purpose of the action. The statute applies.

3. Removal of minor's disabilities.

The sale in question was confirmed on the 11th day of October, 1881. Mrs. O'Connor held adverse possession after that date. This action was brought on the 13th of October, 1887, at which time Biscoe and Blanche Hindman had been of age more than three years, and were barred from maintaining it. Three years had not expired when Thomas C. arrived of age. But it is said, his disabilities of non-age were removed by the Phillips circuit court on the 15th of November, 1881, and that, at the time this action was commenced, more than three years had elapsed during which he was under no disability. On the other hand it is contended that the judgment of the circuit court which declared his disabilities removed was void for want of jurisdiction.

The authority to remove the legal disabilities of minors was conferred upon circuit courts by an act of the General Assembly, which was approved February 18, 1869. Section 2 of the act, after providing that circuit courts shall have authority to remove legal disabilities of minors, adds: *"Provided,* the person praying such relief shall be a resident of the county in which the court to which such application shall be made is held." That act makes the residence jurisdictional—a condition upon which the court can remove the disabilities of the minor.

The record shows that Biscoe and Thomas C. Hindman made an application to the circuit court of the county of Phillips for the removal of their disabilities, and that their application was granted. It does not appear in their application or in the order removing their disabilities that either of them was a resident of Phillips county. Is the order void for want of jurisdiction?

In *Harvey* v. *Tyler,* 2 Wall., 328, 342, the Supreme Court of the United States uses the following language: "The

jurisdiction, which is now exercised by the common law courts in this country, is, in a very large proportion, dependent upon special statutes conferring it. * * * In all cases where the new powers, thus conferred, are to be brought into action in the usual form of common law or chancery proceedings, we apprehend there can be little doubt that the same presumptions as to the jurisdiction of the court and the conclusiveness of its action will be made, as in cases falling more strictly within the usual powers of the court. On the other hand, powers may be conferred on the court and duties required of it, to be exercised in a special and often summary manner, in which the order or judgment of the court can only be supported by a record which shows that it had jurisdiction of the case."

In *Galpin* v. *Page*, 18 Wall., 350, 371, the court said: "But where the special powers conferred are exercised in a special manner, not according to the course of the common law, or where the general powers of the court are exercised over a class not within its ordinary jurisdiction upon the performance of prescribed conditions, no such presumption of jurisdiction will attend the judgment of the court. The facts essential to the exercise of the special jurisdiction must appear in such cases upon the record." To the same effect see *Pulaski County* v. *Stuart*, 28 Gratt., 872; *Gibney* v. *Crawford*, 51 Ark., 35; *Foster* v. *Waterman*, 124 Mass., 592; *Furgeson* v. *Jones*, 11 Am. St. Rep., 808; S. C., 17 Oregon, 204; *Brown* v. *Wheelock*, 12 S. W. Rep., 111; 1 Black on Judgments, sec. 279; Freeman on Judgments, sec. 123.

The power to remove the disabilities of minors is a special power conferred upon the circuit courts, and is to be exercised in a summary manner and not according to the course of the common law. The record does not show the fact— the residence of the minors in Phillips county—necessary to give the Phillips circuit court authority to remove the disabilities of Biscoe and Thomas C. Hindman; and the order declaring the removal of their disabilities is void.

This action is not barred as to Thomas C. Hindman. He has not ratified the sale of the block in question by receiving any part of the proceeds thereof since he arrived of age. He is entitled to one-fourth of the block and to one-fourth of the rents and profits which have accrued since the 11th of October, 1881, the day on which the sale was confirmed by the probate court, and Mrs. O'Connor is entitled to the remaining three-fourths of the block and of the rents and profits. He should be charged, in account with Mrs. O'Connor, with the proceeds of the sale paid to him, or for him to any one authorized to receive the same, and lawful interest thereon from the date of the payment, and with one-fourth of the taxes paid by her on the block since the sale and interest thereon, and one-fourth of the value of the improvements made by her on the block since the sale and credited with the one-fourth of the rents and profits. If the property can be divided without prejudice to the interest of the parties concerned, it should be partitioned between them according to their respective interests; and if not, it should be sold and the proceeds of the sale divided according to their interests. Upon an account being stated as to the rents, profits, purchase money received by Thomas C. Hindman, interest, taxes and improvements, the balance should be made a charge on the part or interest in the block, or in the proceeds of the sale thereof, if it be sold for partition, belonging to the party against whom it is found, and the payment of it (the charge) should be enforced according to the rules of equity.

The decree of the court below is, therefore, affirmed as to Biscoe and Blanche Hindman, and as to Thomas C. Hindman is reversed; and the cause is remanded for proceedings consistent with this opinion.